David S. Casey, Jr., SBN 060768
*dcasey@cglaw.com*
Gayle M. Blatt, SBN 122048
*gmb@cglaw.com*
Jeremy Robinson, SBN 188325
*jrobinson@cglaw.com*
P. Camille Guerra, SBN 326546
*camille@cglaw.com*
Michael J. Morphew, SBN 304463
*mmorphew@cglaw.com*
**CASEY GERRY SCHENK FRANCAVILLA
  BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER MALLOW, individually, and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| TESLA, INC. dba TESLA MOTORS, INC.; TESLA LEASE TRUST; and TESLA FINANCE LLC, | |
| Defendant. | |

Plaintiff Christopher Mallow, ("Plaintiff"), for himself and on behalf of all others similarly situated, brings this class action against Defendants Tesla, Inc., dba Tesla Motors, Inc., Tesla Lease Trust, and Tesla Finance LLC (collectively, "Defendants" or "Tesla").  Plaintiff alleges the following based on personal knowledge as to his own acts, and on information and belief and the investigation conducted by his counsel as to all other allegations:

## I.   NATURE OF THE ACTION

1.     Tesla advertises its vehicles as "engineered to be the safest in the world." In particular, Tesla touts its "Autopilot technology," claiming that its cars' "active safety features can help reduce the severity or prevent accidents from happening altogether."[1] In reality, many of the statements and claims made by Tesla about its advanced driver assistance systems ("ADAS") technology, which is marketed under various names, including "Autopilot," "Enhanced Autopilot," and "Full Self-Driving Capability" ("FSD"), are deceptive and misleading.

2.     Indeed, Tesla's untrue and misleading claims about its vehicles equipped  with ADAS features are the subject of a complaint filed by the State of California Department of Motor Vehicles. The Complaint in that case alleges: "Tesla advertised ADAS features in written marketing materials primarily on Tesla's internet website using the product labels and descriptions:

> a. 'Autopilot'
>
> b. 'Full Self-Driving Capability'
>
> c. The phrase: 'The system is designed to be able to conduct short and long-distance trips with no action required by the person in the driver's seat.'
>
> d. The claims: 'From Home – All you will need to do is get in and tell your car where to go.  If you don't say anything, your car

---

[1] https://www.tesla.com/safety. (Last accessed Sept. 20, 2022).

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7

will look at your calendar and take you there as the assumed
destination.  Your Tesla will figure out the optimal route,
navigating urban streets, complex intersections and freeways.
To your Destination – When you arrive at your destination,
simply step out at the entrance and your car will enter park seek
mode, automatically search for a spot and park itself.  A tap on
your phone summons it back to you.

8
9
10
11
12
13
14

     3.    Instead of simply identifying product or brand names, these
'Autopilot' and 'Full Self-Driving Capability' labels and descriptions represent
that vehicles equipped with the ADAS features will operate as an autonomous
vehicle, but vehicles equipped with those ADAS features could not at the time of
those advertisements, and cannot now, operate as autonomous vehicles. These
advertisements are a deceptive practice." *In re Tesla Inc., dba Tesla Motors Inc.
(Dealer)*, Case No. 21-02189.

15
16
17
18

     4.    Yet, in an effort to increase revenue, sales, and investment, Tesla
continuously deceived and mislead consumers regarding the abilities of its ADAS
technology, knowing that autonomous and semi-autonomous driving technology
is highly coveted by consumers.

19
20
21
22
23

     5.    "For years, Mr. Musk has said Tesla cars were on the verge of
complete autonomy. 'The basic news is that all Tesla vehicles leaving the factory
have all the hardware necessary for Level 5 autonomy,' he declared in 2016. The
Statement surprised and concerned some working on the project, since the
Society of Automotive Engineers defines Level 5 as full driving automation."[2]

24
25
26

     6.    In another misleading and deceptive 2016 tweet, Elon Musk stated
that a Tesla vehicle would complete a fully self-driving trip across the United
States by "next year."

27
28

---

[2] https://www.nytimes.com/2021/12/06/technology/tesla-autopilot-elon-musk.html. (Last
accessed Sept. 20, 2022).

CLASS ACTION COMPLAINT

7.      Tesla continued to make untrue statements in 2016 on its official blog that "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware." The blog post included the misleading October 2016 video of a Tesla car purportedly driving itself without incident, and suggested that Tesla was on the cusp of bringing to market cars that would be fully "self-driving" and have "full autonomy."[3]  When Tesla and Musk made these statements, they knew there was no reasonable chance of Tesla being able to meet those promises.

8.      Tesla continued to deceive and mislead consumers about its "Full Self-Driving Capability" technology throughout 2017-2019.  Tesla's website included statements representing that Tesla owners with the FSD version of its ADAS technology would receive cars capable of "full self-driving in almost all circumstances,"…that could "conduct short and long distance trips with no action required by the person in the driver's seat" and with a "probability of safety at least twice as good as the average human driver."

9.      Tesla's repeated assurances since 2016 continued to promise that the product, the self-driving, fully autonomous vehicle was coming within that year or the next.[4]  Years later, in 2019, Tesla promised consumers that a fully self-driving Tesla car would be available by the end of that year that could deliver a fully automated trip across the country.[5] Yet, Tesla has not lived up to its repeated promises of a fully self-driving car capable of safely traveling any distance-much less a fully automated three-thousand-mile journey across the country.

---

[3]  *See* The Tesla Team, "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware," https://www.tesla.com/blog/all-tesla-cars-being-produced-now-have-full-selfdriving-hardware (Oct. 19, 2016).
[4]  *See, e.g.,* The Dawn Project, "Elon Musk's broken promises," https://dawnproject.com/wpcontent/uploads/2022/06/The-Dawn-Project-Musk-promises-1min-NA.mp4?_=2 (collecting video clips of Musk making such promises from 2014 to 2021).
[5]  Elon Musk, https://twitter.com/elonmusk/status/1126611407984779264 (May 9, 2019, 3:14 pm).

CLASS ACTION COMPLAINT

1     10.    Tesla's ADAS technology is not what Tesla has represented it to be.

2  Rather than being as advertised, the "Full Self-Driving Capability" Plaintiff and

3  fellow consumers paid for is instead used to generate data for Tesla's software

4  programming. Buyers were guinea pigs, used to test Tesla's technology at the

5  expense of injury and sometimes death.

6     11.    Plaintiff Christopher Mallow is a resident of Boca Raton, Florida.

7  Plaintiff purchased a new 2020 Model 3 Tesla Performance Edition and paid an

8  additional $7,000.00 for the "Full Self-Driving Capability" option on or about

9  November 4, 2019.

10     12.    Plaintiff brings this class action lawsuit on behalf of himself and other

11  consumers who purchased or leased a new Tesla vehicle and paid more for

12  Tesla's ADAS technology.

13     13.    Had Plaintiff and other Class members known that Tesla's ADAS

14  technology would not result in a fully self-driving car, they would not have paid

15  more for the technology. As a result of their reliance on partial representations

16  and/or omissions by Tesla, Plaintiff and the other Class members have suffered a

17  loss of money and/or loss in value of their vehicles.

18     14.    Based on information and belief, Plaintiff alleges that at all times

19  mentioned herein, Defendants and all unknown co-conspirators were an agent,

20  servant, employee and/or joint venture of each other, and were at all times acting

21  within the course and scope of said agency, service, employment, and/or joint

22  venture with full knowledge, permission, and consent of each other. In addition,

23  each of the acts and/or omissions of each Defendant and unknown co-conspirator

24  alleged herein were made known to, and ratified by, Defendants. Plaintiff will

25  seek leave of Court to amend this Complaint to reflect the true names and

26  capacities of the unknown co-conspirators when such identities become known.

27     15.    To the extent that there are statutes of limitations applicable to

28  Plaintiff's and Class members' claims, the running of the limitations periods has

CLASS ACTION COMPLAINT

1   been tolled by: equitable tolling, the discovery rule, the fraudulent concealment

2   rules, equitable estoppel, the repair rule, and/or class action tolling.

3   **II.   JURISDICTION AND VENUE**

4       16.    This Court has subject matter jurisdiction over the Magnuson-Moss

5   Warranty Act claim pursuant to 28 U.S.C. § 1331

6       17.    This Court also has jurisdiction over this action pursuant to the Class

7   Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).  The matter in

8   controversy, exclusive of interest and costs, exceeds the sum or value of

9   $5,000,000 and is a class action in which there are more than 100 members of the

10  Classes, members of the Class are citizens of states different from Defendant, and

11  greater than two-thirds of the members of the Class reside in states other than the

12  states in which Defendant is a citizen.

13      18.    In addition, under 28 U.S.C. § 1367, this Court may exercise

14  supplemental jurisdiction over the state law claims because all the claims are

15  derived from a common nucleus of operative facts are such that Plaintiff would

16  ordinarily expect to try them in one judicial proceeding.

17      19.    **Personal Jurisdiction**. This Court has personal jurisdiction over

18  Defendants because they have conducted and continue to conduct substantial

19  business in California, and have sufficient minimum contacts with California in

20  that (1) from the beginning of the Class Period (as defined herein) until December

21  2021, Defendant Tesla, Inc. was headquartered in Palo Alto, California, and thus

22  designed, developed, manufactured, tested, and marketed its vehicles and ADAS

23  technology at issue in this action in California throughout that period; (2)

24  throughout the Class Period, Tesla, Inc. tested and manufactured a substantial

25  percentage of the Class Vehicles (as defined herein) at its factory in Fremont,

26  California; (3) throughout the Class Period, Tesla, Inc. has been the direct or

27  indirect owner and operator of dozens of retail Tesla stores in California

28  (accounting for more than a quarter of Tesla stores nationwide) that market and

sell or lease new Tesla vehicles, including a substantial percentage of Class Vehicles; (4) throughout the Class Period, California has been by far the largest U.S. market for sales and leases of new electric vehicles, including sales and leases of new Tesla vehicles and Class Vehicles; (5) throughout the Class Period, Defendants developed the marketing scheme at issue in this action in California and targeted California consumers with that marketing scheme, including deceptive and misleading statements about Tesla's vehicles and ADAS technology on Tesla's website and Musk's Twitter feed; (6) Tesla, Inc. is registered with the California Secretary of State to do business in the State of California, and is licensed by the California Department of Motor Vehicles as a vehicle dealer and a vehicle manufacturer; and (7) Defendant Tesla Finance LLC has its principal place of business in California.

20.    **Venue.** Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendants' contacts are sufficient to subject them to personal jurisdiction in this District, and therefore, Defendants reside in this District for purposes of venue, or under 28 U.S.C. § 1391(b)(2) because certain acts giving rise to the claims at issue in this complaint occurred, among other places, in this District.

III.    **PARTIES**

A.    **Plaintiff**

21.    Plaintiff Christopher Mallow is a resident of Boca Raton, Florida. Plaintiff purchased a new a Model 3 Performance edition in or about November 4, 2019, from Tesla Inc. at a Tesla location in Boca Raton, Florida. Plaintiff paid an additional $7,000.00 for the "Full Self-Driving Capability" option offered by Tesla.

22.    Prior to purchasing his vehicle, Plaintiff researched, viewed, and relied on Tesla's online and other public statements, including those made by

CLASS ACTION COMPLAINT

Musk, which were disseminated to consumers throughout the State of Florida and the U.S.

**B.   Defendants**

23.   **Tesla, Inc.** Defendant Tesla, Inc., dba Tesla Motors, Inc., is a Delaware corporation that was headquartered in Palo Alto, California from approximately 2003 to December 1, 2021. Defendant has since moved its principal place of business to Austin, Texas. Tesla, Inc. designs, develops, manufactures, tests, markets, distributes, sells, and leases electric vehicles under the brand name "Tesla." Tesla, Inc. also offers services related to those vehicles, including designing, developing, and periodically sending over-the-air updates for the ADAS software in Tesla vehicles.

24.   Tesla's business is fully vertically integrated. Tesla designs, develops, manufacturers, and tests electric vehicles and the ADAS software on those vehicles. This includes all versions of Tesla's ADAS technology (e.g., Autopilot, Enhanced Autopilot, FSD) designed, developed, manufactured, and tested by Tesla at its Palo Alto offices, Fremont factory, and other California offices and facilities. On information and belief, all or a substantial majority of the Class Vehicles (as defined herein) were manufactured and tested in California.

25.   Tesla also markets its vehicles on its website, in marketing materials, in its brick-and-mortar galleries and showrooms, and through the tweets, media interviews, news conferences, earnings calls, conferences, forums, and other public events and statements by its representatives and agents, including Elon Musk. All of these are designed to generate media coverage and have been successful at doing so.

26.   Finally, Tesla sells and leases its electric vehicles directly to consumers, including through its website and retail stores, which Tesla owns and operates. Customers cannot buy new Tesla vehicles except directly from Tesla.

27.     **Tesla Lease Trust**. Defendant Tesla Lease Trust is a Delaware statutory trust, and its initial beneficiary is Tesla Finance LLC. Tesla Lease Trust is the title holder to the Tesla vehicles that are leased under a leasing program managed by Tesla Finance LLC.

28.     **Tesla Finance LLC**. Defendant Tesla Finance LLC is a wholly owned subsidiary of Tesla, Inc., and is the beneficial owner of the leasing assets held in Trust by Tesla Lease Trust. As an agent of the Tesla Lease Trust, Tesla Finance LLC originates, services, administers, and collects leases for Tesla Lease Trust. Tesla Finance LLC is incorporated in Delaware and has its principal place of business in California.

## IV.   FACTUAL ALLEGATIONS

### A.   The Technology of Autonomous Vehicles

29.     As the idea of automated or partially automated driving began to manifest in reality, SAE International[6] published the initial version of SAE J3016 Recommended Practice: Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles, commonly referred to as the SAE Levels of Driving Automation ("SAE Levels"). Following this, SAE International published revised versions of the SAE Levels in 2016, 2018, and 2021.[7]

30.     SAE J3016 addresses motor vehicle driving automation systems that perform part or all of the dynamic driving task on a sustained basis, and features three primary actors in driving: the human user, the driving automation system, and other vehicle systems and components.[8]

---

[6] SAE International is a global association of more than 128,000 engineers and related technical experts in the aerospace, automotive and commercial vehicle industries. https://www.sae.org/. (Last accessed Sept. 22, 2022).

[7] *See* SAE International, "Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles" (revised Apr. 30, 2021), https://www.sae.org/standards/content/j3016_202104.

[88] https://blog.ansi.org/defining-automated-driving-systems-sae-j-3016-2021/#gref. (Last accessed Sept. 22, 2022).

31.     SAE J3016 defines six levels of driving automation and was adopted by the U.S. Department of Transportation. The higher the SAE level, the more the driving tasks become the responsibility of the automation systems. Thus, Level 0 corresponds to a conventional automobile that doesn't make use of driving automation technologies, and Level 5 is an automobile where the primary user is a passenger and not a driver.

a.  **Level 0: No Driving Automation.** Manual control. The human driver performs all driving tasks (steering, acceleration, braking, etc.), although vehicles may have safety features like automatic emergency braking and forward collision warning.

b.  **Level 1: Driver Assistance.** The vehicle features a single automated system (e.g., adaptive cruise control, lane-keeping assistance).

c.  **Level 2: Partial Driving Automation.** The vehicle can perform multiple driving tasks (e.g., acceleration, steering) but remains under the human driver's constant supervision, responsibility, and control.

d.  **Level 3: Conditional Driving Automation.** With environmental detection capabilities, the vehicle can perform most driving tasks, but human override is still required.

e.  **Level 4: High Driving Automation.** The vehicle can perform all driving tasks under specific circumstances, but human override is still an option.

f.  **Level 5: Full Driving Automation.** The vehicle can perform all driving tasks under all conditions, with zero human attention or interaction required.

32.     In 2014, Tesla announced its first version of Autopilot. Six years later, it rolled out its first version of full self-driving beta software. But in spite of Tesla

and Musk's continued promises that Tesla's SAE Level 2 ADAS technology (including Autopilot and FSD) would rapidly advance to SAE Level 5 abilities within a year or other short period of time, Tesla's technology is still classified as SAE Level 2.

33.     Manufacturers, such as Audi, Honda and Mercedes-Benz have successfully designed and developed SAE Level 3 features. Further, Waymo operates limited SAE Level 4 taxi service on public roadways in some areas of Phoenix and San Francisco.  While self-driving technology has been successfully incorporated into other vehicles, Tesla is still classified as Level 2.

34.     The consensus among autonomous vehicle experts is that truly autonomous, self-driving cars cannot be achieved without some reliance on LIDAR technology (3-D laser distance imaging technology), which Tesla has always refused to use because of considerations related to expense and aesthetics. But the successful design and development of safer and more advanced Level 3 and 4 systems to date has universally relied on a more robust and expensive combination of cameras, multiple radar units, and one or more LIDAR units. Meanwhile, Tesla's Level 2 technology relies heavily on cameras (with limited assistance from a single forward-facing radar unit).

## B.     Tesla's Autopilot

35.     In 2014, Tesla began equipping its Model S sedan with hardware that was intended to allow vehicles to automate some steering, braking, and acceleration functions. Consistent with widely used industry terminology, Tesla originally called this feature "advanced driver assistance" before Tesla decided to change the name to "Autopilot." Tesla engineers expressed concerns that the name was misleading and suggested less misleading options such as "Copilot," which Tesla rejected.[9]

---

[9]  Cade Metz & Neal E. Boudette, "Inside Tesla as Elon Musk Pushed an Unflinching Vision for Self-Driving Cars," *The New York Times* (Dec. 6, 2021), *available at* https://www.nytimes.com/

36.     In October 2015, Tesla released its version 7.0 software, which enabled Autopilot on Model S vehicles. Evan Nakano, a Tesla Autopilot engineer who had worked on safety features, objected that Autopilot was not ready for release. When Tesla ignored his concerns, Nakano resigned in protest and wrote a resignation letter, circulated widely among Tesla employees, that called Autopilot's development based on "reckless decision making that has potentially put customer lives at risk."[10] Robert Rose, the head of the Autopilot project, also left Tesla shortly before the release.

37.     By December 2015, Musk was publicly stating that Tesla vehicles would drive themselves within about two years. He told *Fortune* magazine, "I think we have all the pieces, and it's just about refining those pieces, putting them in place, and making sure they work across a huge number of environments—and then we're done. It's a much easier problem than people think it is."[11]

38.     In January 2016, Musk announced on a conference call with reporters that Tesla's Autopilot was "probably better" than a human driver. He said that Tesla vehicles would be able to drive significantly better than humans within two to three years, and that within about two years drivers would be able to use Tesla's "Summon" feature—which allows drivers to remotely instruct their

---

2021/12/06/technology/tesla-autopilot-elon-musk.html Tesla, "Tesla Self-Driving Demonstration"
(Nov. 18, 2016), https://www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long.

[10]  Ianthe Jeanne Dugan & Mike Spector, "Tesla's Push to Build a Self-Driving Car Sparked Dissent Among Its Engineers," *The Wall Street Journal* (Aug. 24, 2017), *available at* https://www.wsj.com/articles/teslas-push-to-build-a-self-driving-car-sparks-dissent-among-itsengineers-1503742.

[11]  Kristen Korosec, "Elon Musk Says Tesla Vehicles Will Drive Themselves in Two Years," *Fortune*
(Dec. 21, 2015), *available at* https://fortune.com/2015/12/21/elon-musk-interview/.

CLASS ACTION COMPLAINT

vehicle to drive to a specified location—to summon a vehicle from the other side of the country. [12]

39.     Ten days later, 23-year-old Gao Yaning, who had a history of relying on Autopilot to drive, was killed in China on the way home from a family wedding when his Tesla Model S crashed at full highway speed into the back of a large street sweeper. The facts of the crash strongly suggest Autopilot was engaged at the time of the crash.[13]

40.     In February 2016, Consumer Reports tested Tesla's new Summon feature. Although Consumer Reports had previously given Tesla vehicles rave reviews (scoring Tesla's Model S a 99 out of 100 and calling it "the best car we have every tested" in 2013, and scoring another version of the Model S even higher in 2015), this time Consumer Reports' testing revealed that the Summon feature failed to detect "several large objects that a homeowner might leave in a driveway or on the floor of a garage—such as a duffel bag and bicycle—and the car failed to stop before hitting them." Consumer Reports' testers also encountered trouble remotely stopping the car, which resulted in damage to one of the car's wheels and raised significant safety concerns.[14]

41.     A few months later, Joshua Brown was killed in Florida when the Autopilot on his Tesla Model S failed to recognize a tractor-trailer crossing in front his car. He collided with, and then passed under, the trailer at 74 mph.[15] The top third of Brown's car was sheared off. Brown was a Tesla enthusiast who had

---

[12]  Elon Musk, https://twitter.com/elonmusk/status/686279251293777920 (Jan. 10, 2016, 12:11 pm).

[13]  Neal Boudette, "Autopilot cited in Death of Chinese Tesla Driver," *The New York Times* (Sept. 14, 2016), *available at* https://www.nytimes.com/2016/09/15/business/fatal-tesla-crash-in-china-involvedautopilot-government-tv-says.html.

[14]  Jake Fisher, "Tesla to Fix Self-Parking Feature After Consumer Reports Raises Safety Concern," *Consumer Reports* (Feb. 10, 2016), *available at* https://www.consumerreports.org/car-safety/teslafixes-self-parking-feature-after-consumer-reports-raises-safety-concern/.

[15]  NTSB, Investigation No. HWY16FH018, Dkt. No. 2, "Crash Summary Report" (June 19, 2017), *available at* https://data.ntsb.gov/Docket/Document/docBLOB?ID=40453253&FileExtension =.PDF&FileName=Crash%20Summary-Master.PDF.

previously made videos of himself using Autopilot, one of which was retweeted by Elon Musk just a few weeks earlier.[16] Tesla later publicly stated that the Autopilot software on Brown's car failed to detect the white tractor-trailer because it could not distinguish it from the bright sky.[17]

42.     Less than a month later, on June 2, 2016, Musk confidently announced that "autonomous driving" was "basically a solved problem," and that Tesla's Autopilot software was already safer than a human driver on highways. "I think we're basically less than two years away from complete autonomy—*complete*," Musk said.[18]

43.     On July 14, 2016, Consumer Reports took the unusual step of publicly calling on Tesla to take certain actions. It urged Tesla to "change the name of the Autopilot feature because it promotes a potentially dangerous assumption that the Model S is capable of driving on its own." Instead of using the "misleading" name Autopilot, Consumer Reports urged Tesla to "name automated features with descriptive, not exaggerated, titles."[19]

44.     On July 20, 2016, Tesla's official blog published a post by Musk, in which he misleadingly suggested that lack of regulatory approval was a major

[16]  Rachel Abrams & Annalyn Kurtz, "Joshua Brown, Who Died in Self-Driving Accident, Tested Limits of His Tesla," *The New York Times* (July 1, 2016), *available at* https://www.nytimes.com/2016/07/02/business/joshua-brown-technology-enthusiast-tested-the-limits-of-his-tesla.html.
[17]  Neal Boudette, "Elon Musk Says Pending Tesla Updates Could Have Prevented Fatal Crash," *The New York Times* (Sept. 11, 2016), *available at* https://www.nytimes.com/2016/09/12/business/elonmusk-says-pending-tesla-updates-could-have-prevented-fatal-crash.html.
[18]  Recode, "Elon Mush | Full Interview | Code Conference 2016," https://www.youtube.com/watch?v=wsixsRI-Sz4&t=4675s at 1:17:55–1:21:20 (June 2, 2016).
[19]  Consumer Reports, "Consumer Reports Calls on Tesla to Disable and Update Auto Steering Function, Remove 'Autopilot' Name" (July 14, 2016), *available at* https://www.consumerreports.org/media-room/press-releases/2016/07/consumer-reports-calls-on-tesla-to-disable-and-update-autosteering-function-remove-autopilot-name/.

challenge Tesla was facing in bringing to market fully self-driving vehicles: "When true self-driving is approved by regulators, it will mean that you will be able to summon your Tesla from pretty much anywhere. Once it picks you up, you will be able to sleep, read or do anything else enroute to your destination. You will also be able to add your car to the Tesla shared fleet just by tapping a button on the Tesla phone app and have it generate income for you while you're at work or on vacation."[20]

45. In August 2016, after a Tesla driver with Autopilot engaged crashed into a parked vehicle on a Beijing highway and later stated publicly that Tesla had misrepresented Autopilot's capabilities and misled buyers, Tesla removed from its China website a term that translates as "self driving" and replaced it with a term that translates as "self-assisted driving."[21] Tesla did not make any similar changes to its U.S. website.

46. On or about October 16, 2016, German regulators sent Tesla a formal letter reading, "In order to prevent misunderstanding and incorrect customers' expectations, we demand that the misleading term Autopilot is no longer used in advertising the system." The German government also reminded Tesla vehicle owners that Tesla's ADAS technology required, and could only be safely operated with, constant driver attention and supervision.[22]

## C. Tesla's Release of "Enhanced Autopilot" and "Full-Self-Driving Capability"

47. On October 19, 2016, Tesla released its Autopilot 2.0 software and announced that all new Tesla cars would come with a new suite of hardware

---

[20]  Elon Musk, "Master Plan, Part Deux," https://www.tesla.com/blog/master-plan-part-deux (July 20, 2016).

[21]  Jake Spring & Alexandria Sage, "Tesla removes 'self-driving' from China website after Beijing crash," *Reuters* (Aug. 15, 2016), https://www.reuters.com/article/us-tesla-china-crashidUSKCN10Q0L4.

[22] Reuters Staff, "Germany says Tesla should not use 'Autopilot' in advertising," *Reuters* (Oct 16, 2016), *available at* https://www.reuters.com/article/idUSKBN12G0KS.

(called Autopilot Hardware 2) comprising eight cameras, twelve ultrasonic sensors, and a forward-facing radar unit, which Tesla claimed would allow the cars to soon become capable of SAE Level 5 autonomy.[23] To access the hardware, owners would have to pay $5,000 for an "Enhanced Autopilot" feature and another $3,000 for the right to activate Tesla's promised "Full Self-Driving Capability." The Enhanced Autopilot package provided drivers most or all of the features in the FSD package, except for the right to unlimited access to Tesla's soon-to-arrive full self-driving technology, and potential early access to FSD Beta updates Tesla might release on its way perfecting that technology.

48.     As part of the announcement, Tesla published on its official blog a post titled "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware," stating "[w]e are excited to announce that, as of today, all Tesla vehicles produced in our factory – including Model 3 – will have the hardware needed for full self-driving capability at a safety level substantially greater than that of a human driver." In the same post, Tesla stated that "[s]elf-driving vehicles will play a crucial role in improving transportation safety and accelerating the world's transition to a sustainable future," and that "[f]ull autonomy will enable a Tesla to be substantially safer than a human driver."[24]

49.     The blog post included a video made by Tesla's Autopilot team in the weeks before the release, which purported to show a Tesla driving itself without any human intervention from the driver. The video begins with a note saying, "The person in the driver's seat is only there for legal reasons. He is not doing anything. The car is driving itself." However, multiple Tesla Autopilot employees

---

[23] *See* Alex Nishimoto, "All New Tesla Models Will Feature Level 5-Capable Autopilot Hardware," Motor Trend (Oct. 20, 2016), available at https://www.motortrend.com/news/new-tesla-models-willfeature-level-5-capable-autopilot-hardware/.

[24] The Tesla Team, "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware," https://www.tesla.com/blog/all-tesla-cars-being-produced-now-have-full-selfdriving-hardware (Oct. 19, 2016).

CLASS ACTION COMPLAINT

who worked on the video would later report that the route taken by the car had been charted ahead of time by software that created a three-dimensional digital map (a feature unavailable to drivers using the commercial version of Autopilot), and that the video did not accurately show how the car operated during filming. For example, the car kept executing driving tasks poorly and engineers had to run the pre-programmed route over and over again to get video that would make it appear the car capable of driving itself. At one point during filming, the car crashed into a fence while on Autopilot and had to be repaired.[25] None of these facts were referenced in the video or otherwise disclosed by Tesla. The deceptive and misleading video was later used to promote Autopilot's purported abilities, and indeed is still featured on the company's website despite having been debunked for years.[26]

50.    Also on October 19, 2016, the company held a conference call with reporters, during which Musk stated that all new Tesla cars would now include all the cameras, computing power, and other hardware necessary for "full self-driving"—not a technical term but one that suggests truly autonomous operation. Musk further stated that Tesla would "be able to demonstrate a demonstration drive of our full autonomy all the way from LA to New York. So basically from home in LA to let's say dropping you off in Times Square, NY and then having the car parking itself by the end of next year without the need for a single touch."[27] Musk repeatedly represented that autonomous vehicles were safer than human-driven ones, and even warned journalists that they would be "killing

---

[25] *See* Metz & Boudette, *supra* note 10.
[26] *See* Tesla, https://wwwa.tesla.com/autopilot; Tesla, "Tesla Self-Driving Demonstration," https:// www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long (Nov. 18, 2016).
[27]  Xautoworld, "Transcript: Elon Musk's Autopilot 2.0 Conference Call," https://www.xautoworld.com/tesla/ transcript-elon-musk-autopilot-2-conference-call/ (Oct. 19, 2016).

CLASS ACTION COMPLAINT

people" if they wrote negative articles about self-driving technology that
dissuaded people from using it.[28]

51.     According to reporting by multiple outlets, including The Wall Street
Journal and The New York Times, Tesla's decision to promise the technology
would be able to provide "Full Self- Driving" and Musk's statements at the news
conference "took the Tesla engineering team by surprise, and some felt that Musk
was promising something that was not possible." Sterling Anderson, who was the
head of Tesla's Autopilot program at the time, "told Tesla's sales and marketing
teams that they should not refer to the company's technology as 'autonomous' or
'self-driving' because this would mislead the public."[29] In a meeting after the
October announcement, someone asked Mr. Anderson how Tesla could brand the
product "Full Self-Driving," to which he responded, "This was Elon's decision."
Two months later, in December 2016, Mr. Anderson resigned.[30]

52.     On October 20, 2016, the day after the release of Enhanced Autopilot
and FSD, Musk tweeted that Tesla's "Summon" feature was capable of
autonomously driving itself to pick up its owner "even if you are on the other
side of the country."[31]

**D.     Tesla's Continued Failure to Deliver on Its Promise of a Fully Self-Driving Car**

53.     In March 2018, Apple engineer Walter Huang was killed when the
Autopilot on his Tesla Model X became confused at a fork in the highway and
caused the car to veer sharply to the left and crash into a concrete barrier in
Mountain View, California.

---

[28] Kosoff, *supra* note 4; Andrew Batiuk, "Tesla October 19th 2016 Autopilot 2.0 Conference Call With
Visuals Added," https://www.youtube.com/watch?v=-vjGEEF_p5E (Oct. 20, 2016).
[29] Metz & Boudette, *supra* note 10.
[30] Dugan & Spector, *supra* note 12.
[31] Elon Musk, https://twitter.com/elonmusk/status/789022017311735808 (Oct. 20, 2016, 1:34 am).

CLASS ACTION COMPLAINT

54.     In the aftermath of that fatal crash, Tesla publicly released crash data and sought to blame Huang for the accident, violating its agreement with NTSB not to comment on crashes during the course of an investigation, and causing NTSB to remove Tesla as a party to its investigation.

55.     In April 2018, a Tesla with Autopilot engaged struck and killed a pedestrian in Japan.

56.     In September 2018, Musk made a series of tweets about Tesla's stock price and his purported plans to take the company private, which the U.S. Securities and Exchange Commission labeled "misleading." The SEC filed a lawsuit against Tesla and Musk, who settled two days later. Under the settlement, Tesla and Musk agreed to pay $40 million in penalties, Tesla agreed to oversee Musk's communications, and Musk was forced to step down as Tesla's chairman (though he would remain as CEO). Musk would later send at least two tweets that violated the terms of the settlement.

57.     In March 2019, Jeremy Banner was killed when his 2018 Tesla Model 3 with Autopilot engaged drove under a tractor-trailer in Florida. The Banner accident was eerily similar to the 2016 accident that killed Joshua Brown when his car drove under a tractor-trailer, and that led Tesla to announce in September 2016 that the company was confident it had fixed the issue by increasing the software's reliance on radar. The Banner accident demonstrated that Tesla had not fixed this significant flaw in its ADAS technology in September 2016, and still had not done so two-and-a-half years later.

58.     In April 2019, at an event in Palo Alto, California, that Tesla dubbed "Autonomy Day," Musk took to the stage and announced that Tesla vehicles would be capable of full self-driving and autonomously navigating dense urban areas like San Francisco and New York by the end of 2019, and that in two years

the company would be making cars without steering wheels or pedals.[32] Musk also stated, "If you fast forward a year, maybe a year and three months, but next year for sure, we will have over a million robo-taxis on the road," and "I feel very confident predicting autonomous robo-taxis for Tesla next year. … I'm confident we'll have at least regulatory approval somewhere, literally next year." Musk stated the robo-taxis would be a way for Tesla owners to make money when they aren't using their vehicles, with Tesla taking 25 or 30 percent of the revenue and allowing the company to compete with popular ride-hailing services like Uber and Lyft.[33] A few months later, Musk doubled-down on the robo-taxi prediction, tweeting that Tesla would "have a million robotaxis by end of 2020." [34] Tesla has never developed a robo-taxi and is nowhere near doing so.

59.    In May 2019, Tesla released an update to its ADAS "Navigate" feature, which automates some lane-change functions. When Consumer Reports tested the feature, it found that it cut off other cars without leaving enough space, failed to pass in the correct lane, and sometimes struggled to merge into traffic.[35]

60.    In October 2019, Consumer Reports tested Tesla's "Smart Summon" feature, which Tesla claimed would allow owners to use a smartphone app to "summon" their Tesla vehicle to drive itself across a parking lot without any occupants inside the vehicle. Consumer Reports' testing revealed that the feature had difficulty negotiating a parking lot, with the summoned car crossing lane

---

[32]  R. Baldwin, "Tesla promises 'one million robo-taxis' in 2020," https://www.engadget.com/2019-04-22-tesla-elon-musk-self-driving-robo-taxi.html (Apr. 22, 2019).
[33]  Insider, "Watch Elon Musk Unveil Plans For A Tesla Ride-Hailing App," https://www.youtube.com/watch?v=YiWbdZ8ItRs (Apr. 22, 2019); Matt McFarland, "Elon Musk says Tesla will have robo-taxis operating next year," *CNN Business*, https://www.cnn.com/2019/04/22/ tech/tesla-robotaxis (Apr. 22, 2019).
[34]  Elon Musk, https://twitter.com/elonmusk/status/1148070210412265473 (July 7, 2019, 8:24 pm).
[35]  *See* Keith Barry, "Tesla's Updated Navigate on Autopilot Requires Significant Driver Intervention,"
*Consumer Reports* (May 22, 2019), *available at*
https://www.consumerreports.org/autonomousdriving/
tesla-navigate-on-autopilot-automatic-lane-change-requires-significant-driver-intervention/.

lines and wandering erratically "like a drunken or distracted driver."[36] This was nearly four years after Musk's January 2016 tweet that Tesla was two years away from its customers being able to use Summon to have their car come to them even if it was thousands of miles away.[37]

61.    In December 2019, Jenna Monet was killed when the Model 3 she was in crashed into the back of a parked fire truck in Indiana while Autopilot was engaged.

62.    In February 2020, the NTSB called on NHTSA to set stricter standards on Autopilot, citing the high number of Autopilot-related collisions and deaths.

63.    In August 2020, a couple was killed in Saratoga, California, after their Tesla veered off a highway while Autopilot was active.

64.    In September 2020, Consumer Reports published the first in a series of evaluations of Tesla's "Full Self-Driving Capability" technology, finding that the technology caused vehicles to engage in unusual and unsafe behavior, such as stopping at green lights, driving through stop signs, slamming on the brakes for yield signs when the merge was clear, and stopping at every exit while going around a traffic circle. [38]

65.    On November 20, 2020, Tesla attorneys sent the California Department of Motor Vehicles ("DMV") a letter (later released via a Public Records Act request) in response to the DMV's questions about the FSD "City Streets" feature that was about to be released to some Tesla owners in a software update. Tesla's legal counsel wrote, "For context, as we've previously discussed,

---

[36]  Jeff Plungis, "Tesla's Smart Summon Performance Doesn't Match Marketing Hype," Consumer Reports (Oct. 8, 2019), available at https://www.consumerreports.org/automotive-technology/teslassmart-summon-performance-doesnt-match-marketing-hype/.
[37]  Musk, *supra* notes 14, 33.
[38]  See Mike Monticello & Keith Barry, "Tesla's 'Full Self-Driving Capability' Falls Short of Its Name: The pricey option doesn't make the car self-driving, and now Tesla's promises are under scrutiny by state regulators in California," Consumer Reports (Sept. 4, 2020) (last updated May 19, 2021), available at https://www.consumerreports.org/autonomous-driving/tesla-full- self-driving- capabilityreview-falls-short-of-its-name-a1224795690/.

CLASS ACTION COMPLAINT

City Streets continues to firmly root the vehicle in SAE Level 2 capability." The letter goes on to explain in detail FSD's limitations and to admit that the system is nowhere near being fully autonomous or fully self-driving:

> City Streets' capabilities with respect to the object and event detection and response (OEDR) sub-task are limited, as there are circumstances and events to which the system is not capable of recognizing or responding. These include static objects and road debris, emergency vehicles, construction zones, large uncontrolled intersections with multiple incoming ways, occlusions, adverse weather, complicated or adversarial vehicles in the driving path, unmapped roads. As a result, the driver maintains responsibility for this part of the dynamic driving task (DDT). In addition, the driver must supervise the system, monitoring both the driving environment and the functioning of City Streets, and he is responsible for responding to inappropriate actions taken by the system. The feature is not designed such that a driver can rely on an alert to draw his attention to a situation requiring response. There are scenarios or situations where an intervention from the driver is required but the system will not alert the driver. In the case of City Streets (and all other existing FSD features), because the vehicle is not capable of performing the entire [39]

66.     On December 14, 2020, in another letter to the California DMV (released via a Public Records Act request), Tesla's legal counsel reiterated that any final release of the FSD City Streets feature to the Tesla customer fleet "will continue to be an SAE Level 2, advanced driver-assistance feature" that, like all other FSD features, "do[es] not make the vehicle autonomous" and is "intended for use only with a fully attentive driver who has his or her hands on the wheel and is prepared to take over at any moment." Tesla's counsel continued, "Please note that Tesla's development of true autonomous features (SAE Levels 3+) …

---

[39]  Letter from Eric Williams (Tesla) to Miguel Acosta (DMV) Re: City Streets – Pilot Release at 1
(Nov. 20, 2020), *available at* https://www.plainsite.org/documents/242a2g/california-dmv-teslarobotaxi-
ADAS-emails/.

CLASS ACTION COMPLAINT

1    will not be released to the general public until we have fully validated them and

2    received any required regulatory permits or approvals."[40]

3        67.    On December 28, 2020, in another letter to the California DMV

4    (released via a Public Records Act request), Tesla's legal counsel again reiterated

5    the SAE Level 2 nature and limitations of Tesla's FSD technology:

6            Full Self-Driving (FSD) Capability is an additional
             optional suite of features that builds from Autopilot and is
7            also representative of SAE L2. Features that comprise FSD
             Capability are Navigate on Autopilot, Auto Lane Change,
8            Autopark, Summon, Smart Summon, Traffic and Stop
             Sign Control, and, upcoming, Autosteer on City Streets
9            (City Streets). While we designed these features to become
             more capable over time through over-the-air software
10           updates, currently neither Autopilot nor FSD Capability is
             an autonomous system, and currently no comprising
11           feature, whether singularly or collectively, is autonomous
             or makes our vehicles autonomous. This includes the
12           limited pilot release of City Streets.[41]

13       68.    During the same month that Tesla's legal team was assuring

14   California regulators that the most advanced version of its ADAS technology was

15   still at SAE Level 2 and suggesting it was likely to remain at Level 2 for the

16   foreseeable future, Elon Musk gave an interview to Business Insider in which he

17   promised that Tesla would achieve Level 5 before the end of the following year,

18   stating "I'm extremely confident that Tesla will have level five next year,

19   extremely confident, 100%." [42]

20

21   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [40] Letter from Eric Williams (Tesla) to Miguel Acosta (DMV) Re: City Streets – Pilot Release at
22   2-3 (Dec. 14, 2020), *available at* https://www.plainsite.org/documents/242a2g/california-dmv-
     teslarobotaxi-
23   ADAS-emails/.

     [41] Letter from Eric Williams (Tesla) to Miguel Acosta (DMV) Re: Autonomous Mode
24   Disengagements for Reporting Year 2020 at 1-2 (Dec. 14, 2020), *available at*
     https://www.plainsite.org/documents/
25   242a2g/california-dmv-tesla-robotaxi-ADAS-emails/; *see also* David Silver, "Tesla Emails To
     The California DMV Emphasize Continued Reliance On Maps," *Forbes* (Mar. 9, 2021), *available*
26   *at* https://www.forbes.com/sites/davidsilver/2021/03/09/tesla-emails-to-the-california-
     dmv-emphasizecontinued-reliance-on-maps/?sh=2c0884c957e6.
27   [42] Mathias Döpfner, "Elon Musk reveals Tesla's plan to be at the forefront of a self-driving-car
     revolution," *Business Insider*, https://www.businessinsider.com/elon-musk-interview-axel-
28   springertesla-

69.     In January 2021, Tesla reported $721 million in profit in 2020, its first profitable year. This was a dramatic turnaround in the company's financial condition from prior years. As recently as 2018, Tesla had been burning through cash, was in danger of running out of money, and at one point was approximately only one month away from having to declare bankruptcy.[43]

70.     In a January 2021 earnings call, Musk stated that the company had made "massive progress on Full Self-Driving," and that it "will become obvious later this year" that "Tesla Autopilot is capable of full self-driving." Musk also stated, "I'm highly confident the car will drive itself for the reliability in excess of a human this year. This is a very big deal." When a financial analyst asked Musk why he was confident Tesla would achieve SAE Level 5 autonomy in 2021, Musk responded, "I'm confident based on my understanding of the technical roadmap and the progress that we're making between each beta iteration." [44]

71.     Six weeks later, on a phone call with California DMV regulators, Tesla's director of Autopilot software, CJ Moore, contradicted Musk. According to an internal DMV memo memorializing the call (released via a Public Records Act request), "DMV asked CJ to address, from an engineering perspective, Elon's messaging about L5 [Level 5] capability by the end of the year. Elon's tweet does not match engineering reality per CJ." (It appears that the DMV tried but failed to redact that last sentence.) In response to a question from DMV regulators about "how Tesla evaluates the potential advancement of levels of autonomy," Tesla representatives "indicated they are still firmly in L2 [Level 2]." Tesla further told

accelerate-advent-of-sustainable-energy (Dec. 5, 2020).
[43]  *See* Chris Isidore, "Tesla just proved all its haters wrong. Here's how," *CNN Business*, https://www.cnn.com/2020/01/31/investing/tesla-cash-crunch/index.html (Jan. 31, 2020); Chris
Isidore, "Elon Musk: Tesla was month away from bankruptcy," *CNN Business*, https://www.cnn.com/
2020/11/04/tech/elon-musk-tesla-once-got-near-bankruptcy/index.html (Nov. 4, 2020).
[44]  Tesla (TSLA) Q4 2020 Earnings Call Transcript (Jan. 27, 2021), *available at* https://www.fool.com/earnings/call-transcripts/2021/01/27/tesla-tsla-q4-2020-earnings-call-transcript/.

CLASS ACTION COMPLAINT

the DMV that "[t]he ratio of driver interaction would need to be in the magnitude of 1 or 2 million miles per driver interaction to move into higher levels of automation [i.e., Level 3 and higher]."[45] In other words, drivers would need to intervene only once per 1 to 2 million miles before Tesla would proceed to Level 3 software. Tesla's ADAS software, which routinely makes mistakes, is not even remotely close to this level of reliability.

72.    Following up on the March 9, 2021 phone call, the California DMV wrote to Tesla: "Notwithstanding other public messaging from Tesla about developing vehicles capable of full driving automation, Tesla reiterated that the City Streets feature is currently a Society of Automotive Engineers (SAE) level two (2) Advanced Driver-Assistance feature and that Tesla will continue to monitor how participants interact with the feature and make improvements. As mentioned in your [prior] correspondence and per California regulations, should Tesla develop technology features characterized as SAE level 3 or higher, Tesla will seek the appropriate regulatory permitting from the DMV before autonomous vehicles are operated on public roads."[46]

73.    In May 2021, under pressure from the Transportation Committee of the California Senate, the California Department of Motor Vehicles launched an investigation into whether Tesla is deceptively marketing its ADAS technology as making its cars capable of autonomous driving.[47]

74.    In June 2021, in what was widely seen as a response to motor vehicle collisions involving Tesla's ADAS technology, NHTSA issued an unprecedented

[45] Memorandum to File by Miguel Acosta (DMV) Re: Tesla AP City Streets Update (Mar. 9, 2021), *available at* https://www.plainsite.org/documents/28jcs0/california-dmv-tesla-robotaxi-ADAS-notes/.
[46]  Letter from Miguel Acosta (DMV) to Eric Williams (Tesla) (Apr. 21, 2021), *available at* https://www.plainsite.org/documents/28jcs0/california-dmv-tesla-robotaxi-ADAS-notes/.
[47]  *See* Russ Mitchell, "DMV probing whether Tesla violates state regulations with self-driving claims," *Los Angeles Times* (May 17, 2021), *available at* https://www.latimes.com/business/story/2021-05-17/dmv-tesla-california-ADAS-autopilot-safety.

order requiring automobile manufacturers to report any crash involving an
injury, fatality, or property damage that happens while or immediately after a
vehicle is automating some driving tasks.

75.     In early July 2021, Tesla released the FSD Beta 9 version of its FSD
software to certain Tesla vehicle owners. Following the release, Tesla owners took
videos of the software in action that show vehicles missing turns, scraping
against bushes, and veering toward parked cars.

76.     On July 26, 2021, on a quarterly earnings call, Musk told investors and
reporters that he was confident FSD-equipped Tesla vehicles would soon "be able
to drive themselves with the safety levels substantially greater than that of the
average person."

77.     In August 2021, NHTSA opened a preliminary safety defect
investigation into Autopilot, and two U.S. Senators called for the Federal Trade
Commission to investigate what they referred to as Tesla's potentially deceptive
marketing practices surrounding its FSD technology, including Tesla's use of the
phrase "full self-driving" to describe and market a feature that does not make the
vehicle fully self-driving.

78.     On August 31, 2021, NHTSA ordered Tesla to produce documents
and information about the design of its FSD technology, crashes involving that
technology, and marketing materials that make representations about that
technology. Tesla submitted only a partial response to NHTSA, claiming that the
documents and information it had requested was confidential business
information.

79.     On October 12, 2021, NHTSA asked Tesla about its practice of asking
FSD Beta users to sign nondisclosure agreements prohibiting users from sharing
negative information about their experiences using the FSD Beta software.

80.     On October 24, 2021, Tesla pulled back the release of version 10.3 of
its ADAS software, which the company had already made available for drivers to

use on public roads, because of problems the software was having making left turns at traffic lights.

81.    In October 2021, an update to the FSD Beta software caused a major increase in "phantom braking" incidents, in which the software identifies a non-existent threat that triggers the vehicle's emergency braking system. The result is that Tesla vehicles, traveling at various speeds, were suddenly slamming on the brakes for no apparent reason. Tesla initially claimed it had identified the source of the problem and fixed it with a software update released on October 25, 2021, but subsequently issued a formal recall over the issue for the more than 11,000 vehicles using the FSD Beta software in a reported effort to head off adverse action by U.S. regulators.[48] Tesla's claims of having fixed the problem, however, turned out to be false, as driver complaints about "phantom braking" issues soared to 107 NHTSA complaints in the three-month period of November 2021 through January 2022 (compared with only 34 such complaints in the preceding 22 months). Owner complaints to NHTSA included everything from phantom braking incidents that were "happening with NOTHING present in front of my vehicle, and sometimes with nothing around me at all," to an incident where Tesla software slammed on the brakes in response to a plastic bag.[47][49]

82.    On November 18, 2021, CNN Business reported that it spent a morning testing Tesla's FSD technology on the streets of New York City and "watched the software nearly crash into a construction site, try to turn into a stopped truck and attempt to drive down the wrong side of the road." The FSD software reportedly "needed plenty of human interventions to protect us and everyone else on the road," including a driver intervention "every couple of

---

[48] Tom Krisher, "Tesla software recall may head off fight with US regulators," *Associated Press* (Nov. 2, 2021), *available at* https://apnews.com/article/technology-business-softwared3e2107435f432fd9b36ba14898166a0.

[49] Faiz Siddiqui & Jeremy B. Merrill, "Tesla drivers report a surge in 'phantom braking,'" *The Washington Post* (Feb. 2, 2022), *available at* https://www.washingtonpost.com/technology/2022/02/02/tesla-phantom-braking/.

CLASS ACTION COMPLAINT

blocks or so" and multiple instances in which the driver "quickly jerked the wheel to avoid a crash."[48][50]

83.    On December 6, 2021, The New York Times published an article about its investigation into the failures of Tesla's ADAS technology based on interviews with 19 Tesla employees who had worked on designing, developing, and testing that technology at Tesla over the prior decade. The article reported that interviews with the employees indicated that Musk "repeatedly misled buyers" about the abilities of Tesla's ADAS technology.[51]

84.    In January 2022, Musk stated on an earnings call, "My personal guess is that we'll achieve Full Self-Driving this year. I would be shocked if we do not achieve Full Self-Driving safer than a human this year. I would be shocked."

85.    On July 13, 2022, the Dawn Project, an organization dedicated to increasing the software safety, published a paper regarding its testing of a Tesla Model 3 equipped with FSD Beta 10.12.2 (released on June 1, 2022) on a closed racetrack. The purpose of the testing was to determine the FSD software's safety in terms of its ability to detect and avoid hitting small children. The testing was performed on a closed racetrack with the Tesla driving itself between a long row of cones with a child-sized mannequin placed in plain view at the end of the row—i.e., conditions significantly less complex and more favorable to the FSD software than those that would be encountered in the real world. Nevertheless, the testing found that Tesla's FSD software consistently failed to detect the stationary child-size mannequins and "d[id] not avoid the child or even slow

---

[50] Matt McFarland, "We tried Tesla's 'full self-driving.' Here's what happened," *CNN Business*, https://www.cnn.com/2021/11/18/cars/tesla-full-self-driving-brooklyn/index.html (Nov. 18, 2021);
*CNN*, "CNN tests a 'full self-driving' Tesla," https://www.youtube.com/watch?v=2PMu7MD9GvI (Nov. 18, 2021).
[51] Metz & Boudette, *supra* note 10; Tesla, "Tesla Self-Driving Demonstration" (Nov. 18, 2016), https://www.tesla.com/videos/autopilot-self-driving-hardware-neighborhood-long

CLASS ACTION COMPLAINT

down," but instead "repeatedly struck the child mannequin in a manner that would be fatal to an actual child."[52]

86.    On July 14, 2022, the editor-in-chief of Electrek, a website that covers electric vehicles, published an article reviewing his experience of using Tesla's FSD Beta software over the course of two months. His ultimate conclusion was that, despite years of development and updates by Tesla, FSD Beta's "decision-making is still the equivalent of a 14-year-old who has been learning to drive for the last week and sometimes appears to consume hard drugs."[53]

**E.    California DMV Files Complaint Against Tesla For Engaging in Untrue, Misleading, and Deceptive Marketing of its "Autopilot" and "Full Self-Driving" Technology**

87.    On July 28, 2022, following a year-long investigation, the California DMV brought two related administrative enforcement actions against Tesla for "untrue," "misleading," and "deceptive" marketing of its Autopilot and FSD technology. The DMV specifically alleged that Tesla's use of the product labels "Autopilot" and "Full Self-Driving Capability," as well as statements about those technologies that have appeared on Tesla's website in 2022, "represent that vehicles equipped with those ADAS [advanced driver assistance system] features will operate as an autonomous vehicle, but vehicles equipped with those ADAS features could not at the time of those advertisements, and cannot now, operate as autonomous a vehicles." The DMV seeks restitution and the revocation or suspension of Tesla's California vehicle manufacturer license and vehicle dealer license. *See In the Matter of the Accusation Against Tesla Inc. dba Tesla Motors, Inc., a Vehicle Manufacturer*, Case No. 21-02188, Accusation (July 28, 2022); *In the Matter*

---

[52] The Dawn Project, In Scientific Test, Tesla "Full Self-Driving" Technology Consistently Strikes
Child-Sized Mannequins (July 13, 2022), available at
https://dawnproject.com/wpcontent/uploads
/2022/08/The_Dawn_Project_Tesla_ADAS_Test_8_.pdf.
[53]   Fred Lambert, "Elon Musk does the impossible and manages expectations on Tesla's next
Full Self-Driving update," *Electrek* (July 14, 2022), https://electrek.co/2022/07/14/elon-musk-
managesexpectations-tesla-next-big-full-self-driving-update/.

*of the Accusation Against Tesla Inc. dba Tesla Motors, Inc., a Vehicle Dealer*, Case No. 21-02189, Accusation (July 28, 2022).

## V.   CLASS ACTION ALLEGATIONS

88.   Plaintiff brings this action individually and on behalf of a Nationwide Class and a Florida Subclass (collectively, the "Class")  pursuant to Federal Rule of Civil Procedure 23, defined as follows:

> **Nationwide Class:** All persons who, from January 1, 2016, to the present (the "Class Period"), purchased or leased from Tesla, Inc. (or any entity it directly or indirectly owns or controls, including Tesla Lease Trust and Tesla Finance LLC) a new Tesla vehicle with "Autopilot," "Enhanced Autopilot," or "Full Self-Driving Capability" (the "Class Vehicles").

> **Florida Subclass:** All persons who, from January 1, 2016, to the present (the "Class Period"), purchased or leased from Tesla, Inc. (or any entity it directly or indirectly owns or controls, including Tesla Lease Trust and Tesla Finance LLC) a new Tesla vehicle with "Autopilot," "Enhanced Autopilot," or "Full Self-Driving Capability" (the "Class Vehicles") and who either purchased or leased that vehicle in Florida or who currently reside in Florida.

Excluded from the Class are: Defendants, any entity in which Defendants directly or indirectly have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants, and judicial officers to whom this case is assigned and their immediate family members.

89.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claim on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

90.   Plaintiff reserves the right to re-define the Class definition after conducting discovery.

91. **Numerosity**. Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

92. **Commonality**. There are numerous questions of law and fact that are common to Plaintiff and the Class that predominate over any question affecting only individual Class members. These common legal and factual questions include, but are not limited to:

      i.   Whether Defendants and their agents (collectively, "Defendants") engaged in the conduct alleged herein;

     ii.   Whether Defendants' use of the terms "Autopilot," "Enhanced Autopilot," "Full Self-Driving," and "Full Self-Driving Capability" to describe their ADAS technology was false, deceptive, or misleading;

    iii.   Whether Defendants knew or should have known that their public statements and omissions about when Tesla vehicles would be, or would likely be, fully self-driving were false, deceptive, or misleading;

    iv.   Whether Defendants knew or should have known that their prior public statements about when Tesla vehicles would be, or would likely be, fully self-driving were false, deceptive, or misleading, but failed to take steps adequate to correct those prior statements;

     v.   Whether Defendants knowingly concealed from consumers information that would cause a reasonable consumer to conclude or develop material doubts that Defendants' public statements and

omissions about when Tesla vehicles would be, or would likely be, fully self-driving were false, deceptive, or misleading;

vi. Whether Defendants' conduct alleged herein violates consumer protection laws;

vii. Whether Defendants' conduct alleged herein violates warranty laws;

viii. Whether Defendants' conduct alleged herein violates any other laws set forth below in the Claims for Relief;

ix. Whether Defendants' conduct alleged herein actually and proximately caused Plaintiff and Class members to suffer legally cognizable harm; and

x. Whether Plaintiff and Class members are entitled to declaratory relief, injunctive relief, restitution, damages, or any other relief requested herein.

93. **Typicality**. Plaintiff's claims are typical of the other Class members' claims because Defendants' wrongful acts and omissions alleged herein were substantially the same with respect to Plaintiff and all other Class members, Defendants' wrongful acts and omissions alleged herein caused Plaintiff and all other Class members comparable injury, Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff.

94. **Adequacy of Representation**. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members.  Additionally, Plaintiff has retained counsel competent and experienced in complex class action litigation.  As such, Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

95. This action is properly maintained as a class action under Federal Rule of Civil Procedure 23 for the following reasons:

a.      **Class Action Status:** Class action status is appropriate under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by each of the thousands of Class members would create a risk of establishing incompatible standards of conduct for Defendants and inconsistent results for Class members. Class action status is also appropriate under Federal Rule of Civil Procedure 23(b)(1)(B) because prosecution of separate actions by Class members would create a risk of adjudication with respect to individual Class members that, as a practical matter, would be dispositive of other Class members' interests or would substantially impair or impede their ability to protect their interests.

b.      **Declaratory and Injunctive Relief:** Certification under Federal Rule of Civil Procedure 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

c.      **Predominance and Superiority:** Certification under Federal Rule of Civil Procedure 23(b)(3) is appropriate because questions of law and fact common to the Class predominate over the questions affecting only individual Class members.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action.  The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class members to individually seek redress for Defendants' wrongful conduct.  Even if Class members could afford individual litigation, the court system should not be forced to shoulder such inefficiency.  Individualized litigation would create a potential for

1
2
3
4

inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale and comprehensive supervision by a single court.

5
6
7
8
9

96.    **Issue Certification:** Certification of particular issues in this action, including issues of liability and relief sought, is appropriate under Federal Rule of Civil Procedure 23(c)(4) because these issues are common to all Class members, and because resolution of these common issues on a class-wide basis will materially advance the disposition of the litigation as a whole.

10
11
12
13

97.    The Class is ascertainable from Defendants' own records, and there is a well-defined community of interest in the questions of law and fact alleged herein since the rights of each Class member were infringed or violated by Defendants in the same or similar fashion.

14

## CLAIMS FOR RELIEF

15
16

### FIRST CLAIM
### Violation of the California Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et seq.*

17
18

98.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

19
20
21
22
23

99.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, prohibits any unlawful, unfair, or fraudulent business act or practice, including any act or practice that constitutes deception, fraud, misrepresentation, or the concealment, suppression, or omission of a material fact in a consumer transaction, or that is likely to deceive the consuming public.

24
25
26
27
28

100.   Defendants' wrongful acts and omissions alleged herein were and are unlawful, unfair, and fraudulent business acts and practices in violation of the UCL. Defendants' wrongful acts and omissions alleged herein were and are likely to deceive the consuming public in California and throughout the U.S. about the abilities, limitations, and value of Tesla's ADAS packages and technology.

Defendants' wrongful acts and omissions alleged herein also constitute deception, fraud, and misrepresentation, and concealment, suppression, and omission of material facts in the context of consumer transactions with Plaintiff and Class members.

101.    Defendants knew or should have known that their wrongful acts and omissions alleged herein were likely to deceive the consuming public in California and the rest of the U.S., and Defendants committed those acts and omissions anyway for their own financial gain, including by shoring up and otherwise improving their financial condition, avoiding bankruptcy, increasing the likelihood of receiving new capital from investors, increasing their revenue and profits, and increasing the value of Tesla (including by increasing its share price).

102.    Defendants' "unfair" business acts and practices under the UCL include, among other things, Defendants': (a) marketing and referring to Tesla's ADAS packages and technology as "Autopilot," "Full Self-Driving," and "Full Self-Driving Capability"; (b) providing information about the capabilities, limitations, and value of Tesla's ADAS packages and technology to the consuming public that is materially different from the information Defendants contemporaneously provided to regulators, especially when provided in a non-public way or in a way not contemporaneously available to the public (*e.g.*, a FOIA or Public Records Act request is required to obtain the information); (c) marketing Tesla's ADAS packages and technology in a way that largely or entirely focuses on its actual or purported abilities in forums likely to generate significant public attention or otherwise reach a relatively large number of relevant consumers (*e.g.*, Musk's Twitter feed, interviews with high-distribution or otherwise influential media, news conferences and other public events likely to generate media coverage, pages on the Tesla website that potential Tesla customers are more likely to visit than other pages on the website and have a

1  relatively high number of views compared to other pages on the website), while

2  relegating information about the ADAS packages and technology's flaws and

3  limitations to forums likely to generate little public attention or otherwise reach a

4  relatively small number of relevant consumers (*e.g.*, pages on the Tesla website

5  that potential Tesla customers are unlikely to visit relative to other pages on the

6  website, vehicle user manuals, regulatory filings); (d) misrepresenting or

7  otherwise providing information likely to deceive the public regarding the then-

8  existing abilities and limitations of Tesla's ADAS packages and technology,

9  including versions of that technology then available to some or all eligible Tesla

10 owners, as well as versions of that technology represented as being in the

11 possession of Defendants but not yet available to some or all eligible Tesla

12 owners; (e) misrepresenting or otherwise providing information likely to deceive

13 the public regarding misrepresenting the likely future abilities and limitations of

14 Tesla's ADAS packages and technology and the time periods in which those

15 future abilities would likely be achieved and the future limitations likely reduced

16 or eliminated; and (f) otherwise disseminating, not disseminating, or causing to

17 be disseminated or not be disseminated to the consuming public information

18 likely to deceive the consuming public in California and the rest of the U.S.

19       103.   Defendants' acts, omissions, and conduct alleged herein were and are

20 "unfair" under the UCL because they are offensive to public policy and constitute

21 immoral, unethical, oppressive, and unscrupulous activities that caused and

22 continue to cause substantial injury to the consuming public, including Plaintiff

23 and Class members. The harm caused by Defendants' conduct greatly outweighs

24 any countervailing benefits to consumers or competition.

25       104.   Defendants have engaged in "unlawful" business acts and practices

26 by, as set forth in this Complaint, violating the Magnuson-Moss Warranty Act, 15

27 U.S.C. § 2301, *et seq.*; violating the California False Advertising Law, Cal. Bus. &

28 Prof. Code § 17500, *et seq.*; and violating their common law obligations.

105.   Defendants have further engaged in "unlawful" business acts and practices by (a) committing "unfair or deceptive acts or practices in or affecting commerce" in violation of 15 U.S.C. § 45; (b) "mak[ing] or disseminat[ing], or caus[ing] to be made or disseminated, before the public in this state … a statement that is untrue or misleading and that is known, or that by the exercise of reasonable care should be known, to be untrue or misleading," in violation of Cal. Vehicle Code § 11713(a); (c) "mak[ing] or disseminat[ing], or caus[ing] to be so disseminated, a statement as part of a plan or scheme with the intent not to sell a vehicle or service … as so advertised," in violation of Cal. Vehicle Code § 11713(a); (d) making "advertised statements, representations, or offers [] in connection with the sale or attempted sale of any vehicle(s)" that is not "clearly set forth," "based on facts," or otherwise violates the Vehicle Code or Title 13, Division 1, Chapter 1 of the California Code of Regulations, in violation of 13 Cal. Code Regs. § 260.00; (e) violating other "provision[s] of Article 1 (commencing with Section 11700) of, or Article 1.1 (commencing with Section 11750) of, Chapter 4 of Division 5 or any rule or regulation adopted pursuant thereto," as referenced in Cal. Vehicle Code § 11705(a)(10); and (f) causing Plaintiff and all other Class members to suffer "loss or damage by reason of any fraud or deceit practiced on that person or fraudulent representations made to that person" within the meaning of Cal. Vehicle Code § 11705(a)(14).

106.   Defendants have engaged in "fraudulent" business acts and practices for all the same reasons set forth in Plaintiff's Claim for Relief for Fraud and Deceit set forth herein, each and every allegation of which Plaintiff hereby re-alleges and incorporates by reference, as though fully set forth in this Claim for Relief.

107.   Defendants' wrongful conduct and the harm it has caused, and continues to cause, was and is not reasonably avoidable by Plaintiff, Class members, or the consuming public. At all relevant times, Defendants knew or

should have known that Plaintiff and Class members would not have reasonably known or discovered that so many of Defendants' misrepresentations regarding the capabilities, limitations, and value of Tesla's ADAS packages and technology were false, deceptive, or misleading.

108.   Defendants' false, deceptive, or misleading representations about the capabilities, limitations, and value of Tesla's ADAS packages and technology were material, and Plaintiff's and Class members' reasonable reliance on the truth and accuracy of those material misrepresentations was a substantial factor in influencing Plaintiff and Class members to purchase or lease Class Vehicles and ADAS packages from Defendants.

109.   As a direct and proximate result of Defendants' wrongful conduct, Defendants (a) have received and will continue to receive revenue, profits, and other benefits that it would not have received if it had not engaged in conduct violating the UCL as alleged herein, and (b) have obtained, and will continue to obtain, an unfair advantage over similar businesses that represent their goods and services in a manner that either does not violate the UCL, or that violates the UCL to a lesser extent than Defendants.

110.   As a direct and proximate cause of Defendants' UCL violations, Plaintiff and other Class members have each suffered a monetary injury because they each paid Tesla money for a good or service (*i.e.*, a vehicle with full self-driving capability) that Tesla has never provided, and Defendants have and continue to wrongfully retain those monies paid by Plaintiff and Class members.

111.   Unless Defendants are enjoined from engaging in conduct alleged herein that violates the UCL, members of the consuming public will be further harmed by that conduct.

112.   As a result of Defendants' UCL violations and the harm caused thereby, Plaintiff and Class members seek and are entitled to (a) injunctive relief to protect the consuming public by prohibiting Defendants from engaging in their

past and ongoing acts, omissions, and conduct that violate the UCL; (b) restitution of the full value of all monies and other consideration that Plaintiff and Class members paid Defendants to add ADAS packages to their Class Vehicle and that Defendants continue to wrongfully retain, including any diminished value of Plaintiff's and Class members' Class Vehicles and ADAS packages and disgorgement of the profits Defendants derived from their wrongful conduct; (c) an award of reasonable attorneys' fees under Cal. Civ. Proc. Code § 1021.5 and any other applicable law; and (d) all other relief prayed for below.

**SECOND CLAIM**
**Violation of the California False Advertising Law**
**Cal. Bus. & Prof. Code § 17500,** *et seq.*

113.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though full set forth in this Claim for Relief.

114.   Defendants' conduct alleged herein violates California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, which makes it unlawful for a business to make, disseminate, or cause to be made or disseminated to the public "any statement, concerning … personal property … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.* § 17500.

115.   The Class Vehicles and ADAS packages (including all ADAS hardware, software, and rights to receive updates and use the same) are "personal property" within the meaning of the FAL.

116.   Any express or implied representation, material omission of information, or failure to correct a past material misrepresentation or omission regarding the abilities, limitations, or value of the Class Vehicles and ADAS packages and technology is a "statement[] concerning personal property" within the meaning of the FAL.

117.   Defendants violated the FAL by making, disseminating, and causing to be made or disseminated to the public statements about the abilities,

limitations, flaws, and value of Tesla's ADAS packages and technology that were "untrue or misleading" within the meaning of the FAL.

118.   Defendants made, disseminated, or caused to be made or disseminated such public statements in numerous forums, including Tesla's blog and website, Musk's Twitter account, earnings calls and other public statements to investors, conferences and other public events, television, radio, podcasts, and other publicly available media (whether print, video, audio, or other format) that republished such representations and omissions.

119.   Defendants knew or, by the exercise of reasonable care, should have known about each of those statements at or near the time they were made or disseminated, and at all times thereafter.

120.   Defendants knew or, by the exercise of reasonable care, should have known that each of those statements was untrue, misleading, and likely to deceive the public at or near the time it was made or disseminated, and at all times thereafter.

121.   Unless Defendants are enjoined from engaging in the conduct alleged herein that violates the FAL, members of the consuming public will be further harmed by that conduct.

122.   As result of Defendants' FAL violations and the harm caused thereby, Plaintiff and Class members are entitled to and seek (a) injunctive relief to protect the consuming public by prohibiting Tesla from engaging in its past and ongoing acts, omissions, and conduct that violate the FAL; (b) restitution of the full value of all monies and other consideration that Plaintiff and Class members paid Defendants for the purchase or lease of Class Vehicles and ADAS packages, which Defendants continue to wrongfully retain, including any diminished value of Plaintiff's and Class members' Class Vehicles and ADAS packages and disgorgement of the profits Defendants derived from their wrongful conduct; (c)

an award of reasonable attorneys' fees under Cal. Civ. Proc. Code § 1021.5 and any other applicable law; and (d) all other available relief prayed for below.

### THIRD CLAIM
### Violation of the Magnuson-Moss Warranty Act
### 15 U.S.C. § 2301, *et seq.*

123.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

124.   The Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, provides a cause of action for any consumer damaged by the failures of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

125.   The Class Vehicles and the ADAS packages on those vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

126.   Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

127.   Defendants are each a "supplier" and a "warrantor" within the meaning of the Magnuson-Moss Warranty Act,15 U.S.C. § 2301(4)-(5).

128.   Under 15 U.S.C. § 2310(e), Plaintiff and the Class are not required to provide Defendants notice of this class action and an opportunity to cure until the time the Court determines the representative capacity of Plaintiff under Rule 23.

129.   Defendants and their representatives and agents' representations on Tesla's website, Twitter, Tesla marketing materials, and various other media that the Class Vehicles already were or would soon become fully self-driving cars are each written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

130.   Through written and implied warranties, Defendants warranted that the Class Vehicles and the ADAS packages and technology on those vehicles (both as sold or leased, and as periodically updated thereafter) are free from defects, of merchantable quality, and fit for their ordinary and represented use.

131.   Defendants breached their written and implied warranties as described herein. Plaintiff and Class members were lured into purchasing or leasing Class Vehicles with ADAS packages and technology by Tesla's misrepresentations that it already had developed, or would soon complete its development of, ADAS packages and technology capable of making the Class Vehicles fully self-driving. Instead, the Class Vehicles and ADAS packages and technology purchased or leased by Plaintiff and Class members do not perform as promised, are not free of defects, are not of merchantability quality, and are unfit for their ordinary and represented use.

132.   Defendants knew or should have known that they were making express and implied warranties that they would not be able to keep regarding the current and future near-term abilities, limitations, and value of Tesla's ADAS packages and technology, and knew or should have known that Tesla's ADAS packages and technology would not perform as promised, were not free of defects, were not of merchantability quality, and were unfit for their ordinary and represented use. Nevertheless, Defendants repeatedly promised in highly public and sensational ways intended to attract media attention and consumer interest in Tesla's vehicles and ADAS packages and technology that its vehicles already were or would very shortly be fully self-driving.

133.   Plaintiff and Class members were damaged as a result of Defendants' breaches of their warranties because they received Class Vehicles and ADAS packages incapable of performing as Defendants represented, rendering the Class Vehicles and ADAS packages significantly less valuable than represented.

134.   For relief, Plaintiff and the Class are entitled to and seek (a) damages caused by Defendants' breaches of the warranties, including economic damages (based on the return of  the price that Plaintiff and Class members paid Defendants for ADAS packages and/or the difference between the price paid for the Class Vehicles as warranted and the actual value of the Class Vehicles as

delivered) and all other available damages; (b) reasonable attorneys' fees and costs, and (c) all other available relief sought herein.

## FOURTH CLAIM
### Breach of Express Warranty
### Cal. Civ. Code §§ 1791.2(a), 1794

135.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief.

136.   Defendants expressly warranted to Plaintiff and Class members through written statements within the meaning of Cal. Civ. Code § 1791.2(a)(1) (including but not limited to statements that Defendants made or caused to be made on Tesla's website, in Tesla marketing materials, on Musk's Twitter account, in various print media, and other written forums) that the Class Vehicles were fully self-driving, or that they would be fully self-driving within a reasonable time after Plaintiff and Class members purchased or leased their respective Class Vehicles and ADAS packages.

137.   Defendants also expressly warranted to Plaintiff and Class members through use of the samples and models within the meaning of Cal. Civ. Code § 1791.2(a)(2) (including but not limited to videos Defendants produced purporting to show Tesla vehicles driving themselves) that the Class Vehicles were fully self-driving, or that they would be fully self-driving within a reasonable time after Plaintiff and Class members purchased or leased their respective Class Vehicles and ADAS packages.

138.   The Class Vehicles and ADAS packages that Plaintiff and Class members purchased or leased: were not as warranted when they left Tesla's factories, reached Plaintiff and Class members without substantial change in the condition in which they were sold or leased, and did not perform as warranted.

139.   Defendants breached their warranties by knowingly selling or leasing Class Vehicles equipped with ADAS packages and technology that had abilities, limitations, flaws, and value that were different from what Defendants had

1  represented and warranted. Defendants' breaches were "willful" within the

2  meaning of Cal. Civ. Code § 1794(c).

3      140.   As a direct and proximate result of these breaches, Plaintiff and Class

4  members have suffered various injuries and economic losses, including but not

5  limited to (1) purchasing or leasing Class Vehicles and ADAS packages they

6  would not otherwise have purchased or leased; (2) purchasing or leasing an

7  inferior product whose nature and characteristics render it of lesser value than

8  represented; (3) incurring monetary harm from the diminution in the Class

9  Vehicles' and ADAS packages' value and resale value; and (4) purchasing or

10  leasing Class Vehicles and ADAS packages that pose a danger to the health and

11  safety of Plaintiff, Class members, and the public.

12      141.   The failure of the Class Vehicles and ADAS packages to be as

13  warranted was a substantial factor in causing Plaintiff's and Class members'

14  harm, which includes the difference between the prices they paid for their

15  respective Class Vehicles and ADAS packages as warranted and the actual value

16  of their Class Vehicles and ADAS packages as delivered.

17      142.   Plaintiff and the Class are entitled to and seek (a) an injunction

18  prohibiting Defendants from sending or transmitting false, deceptive, or

19  misleading statements to the public regarding the abilities, limitations, flaws, and

20  value of Tesla's ADAS packages and technology; (b) damages caused by

21  Defendants' breaches of the warranties, including economic damages (based on

22  the return of the price that Plaintiff and Class members paid for their respective

23  Class Vehicles and ADAS packages and/or the difference between the price paid

24  for the Class Vehicles and ADAS packages as warranted and their actual value as

25  delivered); (c) consequential and incidental damages; (d) a civil penalty of two

26  times the amount of damages under Cal. Civ. Code § 1794; (d) reasonable

27  attorneys' fees and costs under Cal. Civ. Code § 1794 and any other applicable

28  law; and (e) all other available relief sought herein.

### FIFTH CLAIM
### Breach of Implied Warranties
### Cal. Civ. Code §§ 1791.1, 1792, 1794

143.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though full set forth in this Claim for Relief.

144.   Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*, every sale or lease of consumer goods to a retail buyer is accompanied by an implied warranty of merchantability from both the manufacturer and the retail seller or lessor, and some such sales and leases may also be accompanied by an implied warranty of fitness from both the manufacturer and the retail seller or lessor. *Id.* § 1792-1792.2.

145.   The durations of these implied warranties are coextensive with the duration of the Defendants' express warranty, provided the duration of the express warranty is reasonable, except that the duration of the implied warranties cannot have a duration of less than 60 days or more than one year. *Id.* § 1791.1(c).

146.   Defendants' sale or lease of Class Vehicles and ADAS packages to Plaintiff and Class members was accompanied by Defendants' implied warranty of merchantability, both in their capacities as manufacturer and as retail seller or lessor. *Id.* § 1792.

147.   Defendants' implied warranties of merchantability include warranties that the Class Vehicles and ADAS packages (1) will pass without objection in the trade under the contract description, (2) are fit for the ordinary purposes for which such goods are used; (3) are adequately contained, packaged, and labelled, and (4) will conform to the promises or affirmations of fact made on the container or label. *Id.* § 1791.1(a).

148.   At the time of purchase or lease, or within one year thereafter, the Class Vehicles and ADAS packages and technology failed to conform with Defendants' implied warranty of merchantability because they (1) did not pass without objection in the trade under the contract description, (2) were not fit for

the ordinary purposes for which such goods are used, (3) were not adequately contained, packaged, and labelled, and (4) did not conform to the promises or affirmations of fact made on the container or label. Among other things, the Class Vehicles and ADAS packages did not conform to the promises contained in the labels "Autopilot," "Enhanced Autopilot," and "Full Self-Driving Capability."

149.   Defendants' sale or lease of Class Vehicles and ADAS packages to Plaintiff and Class members was also accompanied by Defendants' implied warranty of fitness, both in their capacities as manufacturer and as retail seller or lessor. *Id.* § 1792.

150.   At the time that Plaintiff and Class members purchased or leased their Class Vehicles and ADAS packages from Defendants, Defendants were in the business of designing, developing, testing, manufacturing, selling, and leasing electric vehicles and ADAS technology in general, and the Class Vehicles and Tesla's ADAS packages and technologies in particular.

151.   Defendants held themselves out as having special knowledge or skill regarding all these general and particular subject matters. Further, Defendants knew or had reason to know that Plaintiffs and Class members required the Class Vehicles and ADAS packages for a particular purpose, and that Plaintiff and Class members were relying on Defendants' skill and judgment to furnish goods suitable for that purpose.

152.   Defendants breached the implied warranty of fitness because they failed to deliver Class Vehicles and ADAS packages that were suited to Plaintiff's and Class members' purpose of purchasing or leasing a fully self-driving car.

153.   Defendants breached their warranties by knowingly selling or leasing Class Vehicles equipped with ADAS packages and technology that had abilities, limitations, flaws, and value that were different from what Defendants had represented and warranted. Defendants' breaches were "willful" within the meaning of Cal. Civ. Code § 1794(c).

154.   As a direct and proximate result of these breaches, Plaintiff and Class members have suffered various injuries and economic losses, including but not limited to (1) purchasing or leasing Class Vehicles and ADAS packages they would not otherwise have purchased or leased; (2) purchasing or leasing an inferior product whose nature and characteristics render it of lesser value than warranted; (3) incurring monetary harm from the diminution in the Class Vehicles' and ADAS packages' value and resale value; and (4) purchasing or leasing Class Vehicles and ADAS packages that pose a danger to the health and safety of Plaintiff, Class members, and the public.

155.   The failure of the Class Vehicles and ADAS packages to be as warranted was a substantial factor in causing Plaintiff's and Class members' harm, which includes the difference between the prices they paid for their respective Class Vehicles and ADAS packages as warranted and the actual value of their Class Vehicles and ADAS packages as delivered.

156.   For relief, Plaintiff and the Class are entitled to and seek (a) an injunction prohibiting Defendants from sending or transmitting false, deceptive, or misleading statements to the public regarding the abilities, limitations, flaws, and value of Tesla's ADAS packages and technology; (b) damages caused by Defendants' breaches of the warranties, including economic damages (based on the return of the price that Plaintiff and Class members paid for their respective Class Vehicles and ADAS packages and/or the difference between the price paid for the Class Vehicles and ADAS packages as warranted and their actual value as delivered); (c) consequential and incidental damages; (d) a civil penalty of two times the amount of damages under Cal. Civ. Code § 1794; (e) reasonable attorneys' fees and costs under Cal. Civ. Code § 1794 and any other applicable law; and (f) all other available relief sought herein.

CLASS ACTION COMPLAINT

## SIXTH CLAIM
### Fraud and Deceit
### Cal. Civ. Code §§ 1572, 1573, 1710

157.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though full set forth in this Claim for Relief.

158.   Based on Defendants' conduct alleged in this Complaint, Defendants have engaged in fraud and deceit as set forth in Cal. Civ. Code §§ 1572, 1573, and 1710.

159.   Defendants overstated the utility and safety of Class Vehicles by marketing the Class Vehicles and ADAS packages in a manner that Defendants knew was false and deceptive.

160.   Defendants engaged in misrepresentations, nondisclosure, and concealment of material facts to Plaintiff and Class members, Defendants' conduct was materially false or deceptive, Defendants knew or through reasonable care should have known their conduct was false or deceptive, and Defendants engaged in the conduct with the intent to mislead Plaintiff and Class members.

161.   Plaintiff and the Class members reasonably relied on Defendants' misrepresentations, nondisclosure, and concealment, and were induced by Defendants' wrongful conduct to purchase or lease the Class Vehicles and ADAS packages, which they would not otherwise have purchased or leased.

162.   As a result of Defendants' conduct, Plaintiff and Class members have been harmed. Plaintiff and Class members' reliance was a substantial factor in causing their harm because they were required to stop using Class Vehicles and fear immediate catastrophic injury to themselves and passengers of the Class Vehicles, and people and property surrounding the Class Vehicle.

163.   Plaintiff and Class members have reasonably relied on the material misrepresentations and omissions made by Defendants and have been damaged thereby.

164.   As a direct and proximate result of Defendants' fraud, Plaintiff and Class members have sustained damages in the amount to be determined at trial.

**SEVENTH CLAIM**
**Negligent Misrepresentation**

165.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though full set forth in this Claim for Relief.

166.   Defendants misrepresented the abilities, limitations, and value of Class Vehicles and ADAS packages by marketing the Class Vehicles and ADAS packages as being capable of full self-driving at the time of purchase or lease, or within a reasonable short period thereafter.

167.   Defendants' representations were not true because the Class Vehicles were not capable of full self-driving at the time of purchase or lease, or within a reasonable short period thereafter. Indeed, Defendants appear nowhere near being able to deliver fully self-driving vehicles.

168.   Defendants had no reasonable grounds for believing the representations were true when they made them.

169.   Defendants' misrepresentations, nondisclosure, and/or concealment of material facts to Plaintiff and Class members, as set forth above, were intended by Defendants to mislead Plaintiff and Class members.

170.   Plaintiff and Class members reasonably relied on Defendants' misrepresentations, but were actually misled and deceived, and were induced by Defendants to purchase or lease Class Vehicles and ADAS packages that they would not otherwise have purchased or leased.

171.   Plaintiff and Class members were damaged by Defendants' misrepresentations, and Plaintiff's and Class members' reliance was a substantial factor in causing their harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all other Class members, prays for judgment against Defendants and the following relief:

1.  An order certifying that this action may be maintained as a class action, appointing Plaintiff and his counsel of record to represent the Class, and requiring Defendants to pay the costs of all Class notice and administration of Class relief;

2.  Declaratory and preliminary and permanent injunctive relief prohibiting Defendants from continuing to engage in acts, omissions, and conduct alleged herein that violate any law for which injunctive relief is available, including the California FAL and UCL;

3.  An award of all recoverable damages, actual, general, special, incidental, compensatory, consequential, statutory, and punitive damages, in favor of Plaintiff and the Class, in an amount to be determined at trial;

4.  An order awarding Plaintiff and the Class restitution and disgorgement in an amount to be determined at trial;

5.  An award of reasonable attorneys' fees and costs under Cal. Civ. Proc. Code § 1021.5, Cal. Civ. Code § 780(e), and any other applicable law;

6.  Plaintiff's and the Class's costs of suit;

7.  Pre- and post-judgment interest at the maximum rate provided by law; and

8.  Such other and further relief as the Court may deem proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all issues so triable.

CLASS ACTION COMPLAINT

Dated: September 23, 2022      Respectfully submitted,

By:  /s/ Gayle M. Blatt
GAYLE M. BLATT
**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232
*dcasey@cglaw.com*
*gmb@cglaw.com*
*jrobinson@cglaw.com*
*camille@cglaw.com*
*mmorphew@cglaw.com*

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT